**Decided February 21, 1986**

FILED

IS FEB 21 P 3: 11

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

COMMONWEALTH TRIAL COURT

HENRY OGO, et al.,      )      CIVIL ACTION NO. 83-14(Rota)
                        )
          Plaintiffs,   )
                        )
     vs.                )      MEMORANDUM DECISION
                        )
DR. JOSE CHONG, et al.,)
                        )
          Defendants.   )
_____)

This is an action filed by plaintiffs (husband and wife) against the government-operated Dr. Torres Hospital and Dr. Jose L. Chong, an employee of the hospital, for damages allegedly suffered as a result of a failed vasectomy from which the wife subsequently became pregnant and ultimately gave birth to a sixth child. The action was brought on the theory that defendants negligently failed to follow the standard of care reasonably required of physicians in that plaintiffs were not advised or instructed by defendants to return to the hospital for post-operative sperm testing to determine whether the plaintiff husband, who underwent a vasectomy operation, indeed became sterile.

483

The facts adduced at trial reveal that the plaintiffs reside on Rota. Prior to the birth of their fifth child, they decided that they do not want any more children and that the wife should undergo a tubal ligation to prevent further pregnancy.

For the delivery of their fifth child, the plaintiffs came to Saipan where the wife delivered on June 10, 1982. On the same day, Dr. Helen Taro-Atalig, an employee of Dr. Torres Hospital, talked to the wife and told her that it would be easier and faster for the husband to have a vasectomy[1] than it is for her to undergo a tubal ligation, and suggested that the wife should discuss with her husband the idea of the latter having a vasectomy. Dr. Taro-Atalig briefly described the vasectomy operation to the wife and told her that after the operation the husband should use some form of prophylactic since some sperm would still remain in the seminal vesicle and might cause her to conceive again.

The wife thereafter discussed with her husband the suggestion made by Dr. Taro-Atalig and the two agreed that

---

[1] A vasectomy is a minor operation to sterilize a male, whereby the two vas deferens tubes emanating from the two testicles (where sperm is produced) in the scrotum are incised (i.e. cut), and each ends are sutured, so that sperm cannot travel to the seminal vesicle which adds fluid to the sperm and produces semen, which eventually is released when the male ejaculates. A vasectomy blocks off the flow of sperm, preventing a man from making a woman pregnant.

the husband should have a vasectomy. The following morning, June 11, 1982, the husband came to Dr. Torres Hospital for the vasectomy operation. He was referred to Dr. Jose L. Chong, the hospital's general surgeon. He signed, after reading, the consent form authorizing the hospital to perform the vasectomy. He was then prepared for operation, was operated on, after which he was discharged and left for Rota.

At the start of trial, the parties agreed to try the issue of liability first, and thereafter, try the issue of damages at a later date.

The central issues to be decided by the court is whether Dr. Jose L. Chong, the operating physician, was negligent in failing to advise the plaintiff husband to return to the hospital after the vasectomy operation for a post-operative sperm testing and whether such negligence caused the resulting harm.

Dr. Chong testified that he did not recall seeing the husband after performing the vasectomy operation and subsequent to the patient's discharge. He further testified that he personally did not perform any post-operative sperm testing, although such a procedure is a general policy at the hospital after a vasectomy. Further, he did not know whether any sperm count was taken of the husband, although almost always in vasectomy cases, he tells a patient after an operation to masturbate, the idea being to discharge and release any remaining sperm in the seminal vesicle.

Mr. Ogo, the plaintiff, testified that nobody at the hospital told him to return for a sperm count. He also testified that immediately after the operation he and his wife left for Rota, and that the two resumed their sexual activity about two and one-half months later, or sometime in August, 1982. Prior to resuming sex, he had been masturbating in order to remove the remaining sperm, as was told by Dr. Chong. They had sex daily from August to December, 1982. In January, 1983, his wife learned that she was pregnant and subsequently delivered their sixth child on September 11, 1983.

Dr. Ernesto Aquino, a urology specialist from Guam, testified for the plaintiff that, at plaintiff's request, he examined the husband on November 11, 1983 and performed a sperm count for the husband the results of which showed that the husband was highly fertile, i.e. that the June 11, 1982 vasectomy was a failure. He also testified that it is good medical practice, after vasectomy to conduct a sperm count, in addition to having a histological examination of the cut tissues by a pathologist. According to him, it is not good medical practice to rely solely on a pathological report to determine the success or failure of a vasectomy. He agreed with the vasectomy operating procedure described by Dr. Chong, and further agreed with the practice of having a pathological examination of the tissue specimen in order to verify that the tissues came from the two vas deferens that were severed. However, he would not rely on a pathological report alone

because the vas deferens segments might "recanilize" or merge again. He felt that, in plaintiff's case, recanilization probably occurred. To insure that the chances of recanilization occurring would substantially be diminished, he felt that at least two sperms counts (the first after two weeks, and the second after a month), in addition to a pathological examination of the tissues severed, would assure a 99.9% success rate.

Dr. Robert Haverstock, a surgeon employed at Dr. Torres Hospital since July 1985, testified that a pathological report showing that the two vas deferens were cut is prima facie evidence that a vasectomy was correctly performed. He also testified that not conducting a sperm count after receiving a pathology report showing that both vas deferens were cut is acceptable medical practice. Further, he stated that it takes about one to two weeks (and six weeks at the most) for the remaining sperm in the seminal vesicle to disappear. Finally, the recanilization process, if it ever takes place, could occur as early as four to six months after a vasectomy or even as early as three months. According to him, whether or not a sperm count is taken will not prevent recanilization. He stated that a negative finding pursuant to a histological examination of the tissue specimens shows that the vasectomy was properly performed and is, therefore, satisfactory.

Mrs. Andresina Ogo testified that, although she did discuss the vasectomy operation with Dr. Taro-Atalig, she does not recall any mention of the possibility of recanilization or was ever told to use a "rubber" prophylactic. Further, she testified

that she and her husband began having sex daily about two weeks after the vasectomy, from July to December 1982. She learned she was pregnant in early January, 1983.

The above, therefore, are the facts of this case. Certain of the facts are undisputed; others are disputed or are in conflict. With respect to the main issue, the court should first determine what the standard of care is with respect to vasectomies in the Northern Mariana Islands and in similar localities. Once that is determined, the next question is whether that standard was adhered to or not. Finally, the court must determine whether the failure to follow such standard proximately caused the harm allegedly suffered.

Clearly, it is undisputed that a vasectomy was performed by Dr. Chong at Dr. Torres Hospital. The basic operating procedure was properly followed. Such procedure involved the making of two incisions on the two vas deferens in the patient's scrotum.. Tissues from the two vas, each measuring one to one and one-half centimeter were removed for histological examination. Thereafter, each ends were tied using non-absorbable sutures. Finally the tissue specimens were sent to a pathologist on Guam for an examination to determine whether they are part of the vas deferens. The pathological report confirmed that they were. The plaintiffs argue that the procedure does not or should not end with a pathological verification of the severed tissues. They argue that it is necessary, and therefore a standard of care to be followed, to have a post-operative sperm testing so

488

as to insure within 99.9% that the patient has indeed become sterile. The testimony of Dr. Chong shows that he himself practices such post-operative sperm testing and that it is a policy at the hospital to do so. This coincides with Dr. Aquino's expert testimony that a post-operative sperm counting is an added assurance that the operation would indeed be successful, and that the same is good medical practice. The court, therefore, finds that such a standard is one which surgeons, whether general surgeons or specialists, should and could easily follow, it requiring no special degree of expertise to perform. All it takes is a microscopic examination of one's semen specimen about two weeks after vasectomy. Such, therefore, is a standard of medical care in the Commonwealth and similar localities, such as Guam, that should have been followed.

A physician or surgeon has the duty to use reasonable care and skill in diagnosis and treatment. The standard by which the requirement of reasonable skill and care is determined is the average standard of the profession. He is bound to bestow such reasonable and ordinary care, skill and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like case. The test is whether the physician did commit (or omit) some particular thing or things that physicians and surgeons in that medical community of ordinary skill, care, and diligence would have not committed (or omitted) under the

489

same or similar circumstances. See generally 61 Am. Jur.2d Physicians Surgeons, Etc. §205. Failure to apply that degree of care and skill ordinarily employed by the profession, under similar conditions and in like surrounding circumstances constitute negligence.

The standard in this case was not followed. The unwavering testimony of the plaintiffs, both husband and wife, coupled with Dr. Chong's testimony (1) that he did not recall seeing the plaintiff after the operation for a sperm testing, (2) his assumption that the husband was Dr. Taro-Atalig's patient, (3) that he did not know whether plaintiff's sperm count was ever taken, (4) that it was his usual practice, and a hospital policy (i.e. standard), to have a post-operative sperm count, and (5) that his post-operative notes on the husband's hospital file failed to show any instruction to return to the hospital for a sperm count, all support a finding of failure to follow such standard. The court therefore finds that the doctor, and the hospital vicariously, were negligent in failing to adhere to such standard.

Having found negligence, the final question, for purposes of determining liability, is whether the negligent omission in failing to advise the husband to return for a sperm testing proximately caused the alleged harm suffered.

The defendants contend that irrespective of whether or not a sperm count testing was conducted by the hospital or Dr. Chong, such failure was not the proximate cause of the subsequent pregnancy. To support this contention, defendants

argue that, as testified to by Dr. Aquino himself on behalf of the plaintiff, sperm count testings are usually taken within a period of one month after vasectomy. Further,it was Dr. Aquino's own opinion that recanilization of the severed tissues likely occurred, as a result of which pregnancy took place. Thus, even if a sperm count testing were taken within a month, the fact that Mrs. Ogo became pregnant roughly six (6) months after vasectomy shows that conducting a post-operative sperm testing would not have prevented the pregnancy since, as Dr. Aquino opined, recanilization took place. Such, therefore, was an intervening factor and was the cause of pregnancy, not the failure to perform the sperm count, defendants argue. See, for example, Stewart v. Bepko, 576 F.Supp. 182 (D.C. 1983).

It is undisputed that a vasectomy, even with post-operative sperm testing, does not make it 100% successful. Plaintiff's argue, however, that if a post-operative sperm testing had been made, the chances of success would be 99.9%. In other words, it would be highly unlikely for recanilization to take place and, at the most, would occur in only .1% of the cases.

What disturbs the court, however, even assuming that such statistical rate is true, is the fact that pregnancy took place about six (6) months after the vasectomy, way after the length of time within which post-operative sperm testing should normally be performed. What further disturbs the court is the conflicting testimony between the husband and wife themselves

as to when they began having sex after the operation. The husband testified that they started sex 2 1/2 months later (or sometime in August, 1982); the wife said they resumed their sexual activity about two(2) weeks (or sometime in late June or early July, 1982) after the operation. Such factor is crucial because if the resumption of sex took place within a month after the operation, then the recanilization argument falls because it could reasonably be assumed that the sperm remaining in the seminal vesicle could have more likely than not caused the wife to become pregnant.

The court, however, chooses to believe the husband that he and his wife resumed sex about two and a half months later. This is supported by the fact that pregnancy took place in December (six months later), which indicates that any sperm that had remained in the seminal vesicle after vasectomy would have been discharged within, at the most, six(6) weeks after the operation, as testified to by Dr. Haverstock. Such testimony was uncontradicted. Further, the plaintiffs' own witness Dr. Aquino believed that recanilization took place, and it is uncontradicted that recanilization could take place as early as four to six months after a vasectomy, or even as early as three(3) months. Finally, recanilization (i.e. the reattaching of the severed vas) is a process that does occur, albeit seldom. See Mudge v. Ball, 391 P.2d 201 (Wash. 1964).

The mystery which still remains, however, even assuming that recanilization does occur in certain cases or did occur

in this case, is whether performing a sperm count test within a month after vasectomy would have substantially lessen the chances of recanilization taking place. Put differently, could the probability of recanilization taking place be diminished substantially with a post-operative sperm counting? None of the witnesses directly testified on this point. Except for the failure to perform any sperm testing, both sides agreed that the vasectomy procedure itself was properly performed. Both sides further agreed that the histological verification by the pathologist Dr. Loerzel showed that the two vas deferens were cut. There was no evidence shown that the suturing by Dr. Chong was inadequate, and none was implied.

Therefore, the inevitable conclusion the court reaches is that a sperm count would not have made much difference vis a vis recanilization which apparently occurred between the third and sixth months after vasectomy. The court reaches this conclusion based on its understanding that the purposes of a sperm count are to determine whether any sperm still remain in the seminal vesicle after vasectomy, and to insure, in conjunction with a negative histological examination, that the patient is indeed sterile. The histological examination proved that both vas deferens were severed cutting off the flow of sperm to the seminal vesicle. The fact that sex was resumed two and one half months after vasectomy supports a finding that no sperm would have remained in the seminal vesicle. It logically follows that recanilization occurred sometime between the third and sixth months.

493

Recanilization is something that apparently occurs in a few vasectomy cases. What causes the two severed sections to regenerate was not explained to the satisfaction of the court. Suffice it to say that it is a biological phenomenon which occurs in rare instances and this appears to have been one of those situations. The court thus finds, as a matter of law, that recanilization took place and that the failure to conduct a post-operative sperm count, albeit negligent, was not the proximate cause for the ensuing pregnancy.

The plaintiffs argue that the failure to do the sperm count was a substantial factor which led to the pregnancy.[2] They argue that if the husband had had a sperm testing, the chances for pregnancy would have been substantially diminished by up to 99.9%. Such position has validity up to the first six weeks after vasectomy when the remaining sperm in the seminal vesicle are still present. It fails muster, however, after such period, where a histological exam shows that both vas deferens were cut. After the sixth week, the only possible explanations for the subsequent pregnancy are: (1) recanilization (2) only one vas was cut, or (3) the suturing of the ends of the cut vas was not properly performed. There was no evidence

---

[2]The Restatement of Torts, Second, provides that an actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm. Restatement of Torts, Second, §431.

that either of the last two possibilities took place. Thus, recanilization is the only plausible explanation. Such is therefore the finding of this court.

The substantial factor argument further fails where, as here, the testimony shows that the harm (pregnancy and birth) is from a cause other than the actor's negligence. It is only where the evidence permits a reasonable finding that the defendant's conduct had some effect that the question whether the effect was substantial rather than negligible becomes important. Comment B to Section 431, Restatement of Torts, Second. In this case, although recanilization is a rare biological phenomenon, it is undisputed that such event appears to have been the cause. It is an occurrence entirely outside a physician's control. It is, however, the likeliest reason for the pregnancy. Therefore, the negligent failure to conduct a post-operative sperm count was not a substantial factor.

Based on the foregoing findings the court now concludes as a matter of law:

1. That the failure of defendants to conduct a post-operative sperm testing after a vasectomy was negligent conduct on defendants' part.

2. That such negligent conduct, however, did not proximately cause the alleged harm flowing from the subsequent pregnancy of the plaintiff's wife; and neither did such negligent conduct constitute a substantial basis for the resulting harm.

3. That the proximate cause for the eventual pregnancy and birth was the recanilization of the severed vas deferens.

4.   That the defendants are not liable for the harm plaintiffs allegedly sustained.

The above constitutes the court's findings of facts and conclusions of law, per Rule 52, Com.R. Civ.P.

Judgment in favor of defendants and dismissing this action shall be entered accordingly.

Dated at Saipan, CM, this 21st day of February, 1986.

Jose S. Dela Cruz, Associate Judge